UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BIJAN RAZZAGHI, et al.,

    Plaintiffs,

v.

THE DISTRICT OF COLUMBIA, et al.,

    Defendants.

Civil Action 03-01619 (HHK)

MEMORANDUM OPINION

Plaintiffs, Andrea and Babak Razzaghi ("Razzaghis"), bring this action in their own right and on behalf of their son, Bijan Razzaghi ("Bijan"), against the District of Columbia and the superintendent of the District of Columbia Public Schools (collectively "DCPS"), alleging that DCPS violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and 42 U.S.C. § 1983. Specifically, the Razzaghis seek to overturn a DCPS hearing officer's determination that they are not entitled to reimbursement for Bijan's tuition at a private school. Presently before the court are the parties' cross-motions for summary judgment [#25, 26]. Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that the Razzaghis' motion must be denied and DCPS' motion must be granted.

## I. BACKGROUND

A.     **Statutory Framework**

Congress enacted the IDEA to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). As a condition of receiving federal funds under the IDEA, school districts must identify, locate, and evaluate all children with disabilities who are in need of special education and related services. 34 C.F.R. § 300.125(a)(1)(I). Any disabled child is entitled to a free appropriate public education ("FAPE") and an individualized education program ("IEP"), which consists of educational services tailored to the unique needs of the child. 20 U.S.C. § 1414(d)(2)(A) ("At the beginning of each school year, each [state] shall have in effect, for each child with a disability in its jurisdiction, an individualized education program."), 34 C.F.R. § 300.300(a)(3)(ii).

A full evaluation of a child with suspected disabilities is an integral part of developing an appropriate IEP. Therefore, the IDEA requires states to "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1)(A). Once a child has been evaluated and identified as disabled, the school district must create an IEP tailored to the disabled child's needs. The IEP is developed in a periodic, but no less than annual, meeting of an IEP team consisting of parents, faculty, and evaluators. 20 U.S.C. § 1414(d)(1)(B).

By definition, a "free" appropriate public education means that services, including evaluations, must be "provided at public expense, under public supervision and direction, and

without charge." 20 U.S.C. § 1401(9)(A). If the proposed educational services cannot be provided by the school district, IDEA requires the child's placement in a private school at public expense. *School Committee of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369 (1985). Parents who disagree with their child's evaluation or placement may request an administrative hearing, before an impartial hearing officer, to challenge the IEP. 20 U.S.C. § 1415(f)(1)(A). The hearing officer's determination ("HOD") may then be challenged in federal district court. 20 U.S.C. § 1415(i)(2).

**B.    Factual History**

Bijan is currently twelve years old. He attended John Eaton Elementary School ("Eaton") from 1996 to 2002 for pre-kindergarten through third grade.[1] In the first grade, he exhibited certain behavioral difficulties, such as staying in the bathroom for up to thirty minutes at a time and being unable to stand in place. The following year, his mother felt that he "was having difficulty keeping up with the expectations of the classroom and the teacher," Tr. at 82, and his second-grade teacher, Ms. Bigelow, suggested that the Razzaghis have him evaluated.

On December 13, 2000, the Razzaghis took Bijan to Kingsbury Center for an initial psycho-educational assessment,[2] in January and February of 2001 he returned to Kingsbury

---

[1] Bijan was at Eaton for six years rather than five because he repeated kindergarten.

[2] Kingsbury Center is a privately run institution that offers diagnostic, psychological, tutoring, and consultative services to families with children with learning disabilities or developmental delays. Pls.' Ex. A-3. One division of Kingsbury Center is Kingsbury Day School, which offers individualized instruction in small classrooms for children ages 5 to 16. *Id.*

Center for a comprehensive psycho-educational evaluation.[3] The testing report concluded: "[g]iven the significant interference of Bijan's compulsions with his academic development, it is not possible at this time to determine if he has de facto learning disabilities, or merely academic delays. Similarly, a diagnosis of [Attention Deficit Hyper-Activity Disorder] cannot be given until Bijan's anxiety and related behavior have been addressed." Def. Ex. 3 at 13. On February 14, 2001, the Razzaghis took Bijan to the Children's National Medical Center for a neurological evaluation. The physician who examined him, Dr. Phillip Pearl, diagnosed him with subacute motor tic disorder. He could not determine whether Bijan had a learning disability or ADHD, though he did note that Bijan "appears to meet criteria for ADHD of the predominantly inattentive type." Pls.' Ex. A-18 at 2. On March 21, 2001, Bijan saw Dr. Sherry Goldman, an adolescent psychiatrist, who prescribed medication to address his obsessive compulsive disorder symptoms.[4]

On May 21, 2001, Ms. Bigelow submitted a Teacher Assistance Team ("TAT") referral requesting that DCPS review Bijan's private evaluations and determine if he needed special education services. The following school year, on November 28, 2001, DCPS psychologist Harriet Kuhn performed a psycho-educational evaluation of Bijan. Despite the fact that none of the independent evaluators diagnosed Bijan with a learning disability, Dr. Kuhn concluded that

---

[3]  Bijan was tested at Kingsbury Center by Dr. Ellen Iscoe, Dr. Jennifer Crumlish, and Dr. Laurie Dietzel on January 17, 2001, January 22, 2001, and February 6, 2001. Defs.' Ex. 3 at 1, 15.

[4]  Dr. Goldman did not conduct any testing of her own, though she did review Bijan's medical and educational documentation. Tr. at 12–13, 23. She also did not prepare a report memorializing her consultations with Bijan or her conclusions. *Id.* at 22.

"Bijan appears to be eligible for special education services . . . as a Learning Disabled student."[5]

Pls.' Ex. A-33 at 6.  Accordingly, on December 3, 2001, a multidisciplinary team ("MDT") met to develop an IEP for him.[6] The MDT determined that the only further evaluation Bijan needed was an occupational therapy evaluation.[7]  It then concluded that Bijan should have 7.5 hours of special education and a half an hour of psychological counseling every week.  Of the 7.5 hours of special education, 5 were to be in the classroom and 2.5 were to be in the resource room.  At the conclusion of the meeting, Mr. and Mrs. Razzaghi signed the IEP, signifying their agreement with the plan, their involvement in the process, and their consent to the provision of services.

Eaton began implementing Bijan's IEP in January of 2002.  Shortly thereafter, DCPS contacted the Razzaghis to schedule a meeting to re-evaluate the IEP because Bijan was still having behavioral difficulties.  After the second meeting, which took place on February 13, 2002, the MDT amended the IEP so that all 7.5 hours of services would be in the resource room.  Mr. Razzaghi signed the revised IEP.  On February 20, 2002, Dr. Robert Sands conducted an occupational therapy evaluation of Bijan in accordance with the recommendation of the MDT at the initial IEP meeting.  As a result of Dr. Sands's report, the MDT scheduled a third meeting for March 27, 2002.  On March 13, 2002, just before the third IEP meeting, the Razzaghis took Bijan

---

[5] In addition to reviewing all of Bijan's previous evaluations, Dr. Kuhn administered a number of tests designed to assess Bijan's behavior, intelligence, and cognitive abilities.  She also interviewed Bijan and his teacher and parents, and she observed him in a classroom setting.  Pls.' Ex. A-33 at 1.

[6] The MDT consisted of Mr. and Mrs. Razzaghi, Dr. Kuhn, Ghita Singh (Bijan's third grade teacher), the Assistant Principal, the Guidance Counselor, the Special Education teacher, and a social worker.  Defs.' Ex. 14.

[7] The Special Education teacher subsequently submitted a referral form for Bijan to receive an occupational therapy evaluation on December 14, 2001.  Defs.' Ex. 16.

to Kingsbury Center for a follow-up evaluation. The Kingsbury Center doctors concluded that "it is impossible at this point to determine whether or not Bijan has a de facto learning disability or poor achievement secondary to his compulsions and related attentional difficulties." Defs.' Ex. 24 at 5. Despite this determination, the report also noted that "[p]lacement in a separate day school program for students with learning disabilities is recommended." *Id.* When the MDT met on March 27, 2002, it decided to add thirty minutes per week of occupational therapy to Bijan's IEP. Bijan's mother signed the revised IEP.

Bijan finished his third grade year at Eaton without objection or further modification to his IEP. On August 20, 2002, Mrs. Razzaghi hand-delivered a letter to Eaton indicating that the Razzaghis intended to enroll Bijan at Kingsbury Day School for the upcoming academic year. Once Bijan was at Kingsbury, the staff there informed his parents that he was eligible for funding from DCPS. The Razzaghis then requested a hearing by a letter dated January 17, 2003. The hearing took place over the course of two days, with a different hearing officer on each day. The hearing officer charged with deciding the case ultimately concluded that DCPS met its obligation to make a free appropriate public education available to Bijan and thus denied the Razzaghis' request for tuition reimbursement at Kingsbury Day School. This lawsuit followed.

## II. ANALYSIS

### A.   Governing Legal Principles

When an action is brought under the IDEA, the court is required to review the administrative record, hear additional evidence presented at the request of the parties, and based "on the preponderance of the evidence shall grant such relief as the court determines is

appropriate."[8]  20 U.S.C. § 1415(i)(2)(C).  In arriving at a decision, a district court is to give the hearing officer's determination "due weight." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) (holding that this provision "carries with it the implied requirement that due weight shall be given to" the administrative proceedings).  The "due weight" standard of review does not rise to the level of *de novo* review, however, because "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207.  Yet, the standard is also "less deferential than that applied under the traditional substantial evidence test used in ordinary administrative review cases." *Scorah v. Dist. of Columbia*, 322 F. Supp. 2d 12, 16 (D.D.C. 2004).  It is also well-settled that the "party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong." *Circum. v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)

Parents who unilaterally decide to place their disabled child in private school, without consent of local school officials, "do so at their own financial risk." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *Burlington,* 471 U.S. at 373–74 (1985)).  Parents may receive tuition reimbursement if a court finds "both that the public placement violated IDEA and the private school placement was proper under the Act." *Id.* at 15.  The first factor is a threshold condition, for if the public school placement would have been appropriate, the analysis ends, and a disabled child's parents are not entitled to reimbursement.  20 U.S.C. §

---

[8]  It is established that at the due process hearing, DCPS "shall bear the burden of proof . . . that the action or proposed placement is adequate to meet the educational needs of the student."  5 D.C. Mun. Regs. § 3030.3.  The Razzaghis contend that the hearing officer improperly placed the burden of proof on them.  Pls.' Motion at 23.  However, in his decision, the hearing officer states that he "was persuaded that DCPS met its burden."  Pls.' Ex. B at 10.  The Razzaghis have not identified any part of the hearing officer's decision that indicates that he placed the burden on them rather than DCPS.  Therefore, the Razzaghi's argument fails.

1412(a)(10)(C)(I) (indicating that IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility."); *M.C. v. Valentin Bd. of Educ.,* 226 F.3d 60, 66 (2d Cir. 2000) ("Only if a court determines that a challenged IAP was inadequate should it proceed to the second question."); *TR. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 582 (3d Cir. 2000) ("The threshold question here focuses on the first prong—viz., whether the Board's proposed placement violated the IDEA . . . . The parental reimbursement mandate comes into play only if we answer yes to this initial question.").

    **B.**    **The Razzaghis' Contentions**

*1. Failure to evaluate*

When conducting evaluations of children with suspected learning disabilities, school districts must ensure that "the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). They are required to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" to determine whether the child has a disability and, if so, what should be included in the content of the child's IAP. 20 U.S.C. § 1414(b)(2)(A). The schools must "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability," must "use technically sound instruments," and must "review all existing evaluation data on the child." *Id.* § 1414(b)(2)(B)–(C); § 1414(c)(1)(A).

The Razzaghis contend that DCPS failed to fulfill its obligation to evaluate Bijan in all areas of suspected disability in two respects. First they assert that DCPS did not timely give Bijan an occupational therapy evaluation. Second, they assert that DCPS did not give him a speech/language evaluation. Neither assertion has merit.

As to the assertion that Bijan was not given a timely occupational therapy evaluation, Dr. Sands administered an occupational therapy evaluation to Bijan on February 20, 2002. As a result, the MDT amended Bijan's IAP to include thirty minutes per week of occupational therapy. While it is true that Bijan did not undergo this evaluation until after his IAP was in place, neither party disputes that he was indeed tested. While there undoubtedly are circumstances when a late evaluation operates as the functional equivalent of a failure to evaluate altogether, this case does not present such a circumstance. The delay in conducting the evaluation was not prolonged and Bijan immediately began receiving therapy once his needs were diagnosed.

The Razzaghis' second claim, that DCPS improperly failed to administer a speech/language evaluation, is similarly without merit. Their position is based upon the testimony of Dr. Sheila Iseman, an educational consultant.[9] In support of her conclusion that DCPS should have administered a speech/language evaluation, Dr. Iseman testified that Bijan "has always had difficulties with phonemic awareness," and that "DCPS knew this from kindergarten." Tr. at 282. Dr. Iseman's conclusion is unfounded. Perhaps he refers to the report submitted after

---

[9] Dr. Iseman holds a B.S. in Elementary Education, an M.S. in Special Education, and a Ph.D. in Human Development. Pls.' Ex. 38. The Razzaghis hired Dr. Iseman to review Bijan's records after he had already left Eaton. Tr. at 330. Dr. Iseman did not observe Bijan at Eaton or play any part in developing his IEP. *Id.*

Bijan's first year in kindergarten, in which his teacher wrote: "Bijan still has difficulty with association of sound to letter." Narrative Summary Report, 6/5/98, Pls.' Ex. A-37. However, by the end of his second year in kindergarten, his teacher wrote on his final report card: "[h]is writing has improved, and he is able to recognize letters and associate sound with those letters." *Id.* The teacher indicated that the parents should "continue to reinforce beginning sounds and letters over the summer, so that he is ready for first grade," but nowhere does the record indicate that the teacher, or anyone else at Eaton, suspected that Bijan had a speech/language disability at that time.[10] *Id.*

Likewise, Bijan's subsequent teachers and evaluators at Eaton did not suspect a speech/ language disability. On his final first grade report card, Bijan's teacher noted that "he needs to improve his sight word vocabulary and decoding strategies," but she indicated that his reading, speaking, and listening skills were all advanced, the highest possible level.[11] Teacher Comments, 6/16/00, Pls.' Ex. 37. Ms. Bigelow, Bijan's second grade teacher, stated in her final teacher comments that Bijan should continue to "work on his basic math facts," and she noted that she was pleased that the Razzaghis had Bijan go through a psycho-educational evaluation, but she makes no mention that further testing was appropriate. Teacher Comments, 6/18/01, Pls.' Ex. A-

---

[10] Bijan's kindergarten teacher did note that he "continues to have difficulty following directions," and that "further testing may be helpful in determining the cause of his difficulty." Teacher Comments, 6/11/99, Pls.' Ex. A-37. When Bijan was subsequently tested at Kingsbury Center, the doctors were well aware of this problem and suggested various methods for helping him better follow directions. They did not attribute it to a suspected learning disability, and they did not recommend a speech/language evaluation. Defs.' Ex. 3.

[11] Teachers at Eaton rate students based on a scale of 1 to 4 in each subject area. According to its system, 1 = Below Basic, 2 = Basic, 3 = Proficient, and 4 = Advanced. Pls.' Ex. A-37.

37. Ms. Singh, Bijan's third grade teacher, discusses Bijan's difficulties with math four times on his report card, but she never indicates that he has speech/language problems. Teacher Comments, 6/18/02, Pls.' Ex. A-37. When Dr. Kuhn, the DCPS psychologist, evaluated Bijan, she administered a number of behavior and intelligence tests and also reviewed Bijan's records, interviewed him and his parents, and observed him in class. Pls.' Ex. A-33. In her detailed report, she made seven specific recommendations targeted at helping Bijan improve socially and academically, including a recommendation for an occupational therapy evaluation, but she did not see a need for a speech/language evaluation. *Id.* The independent evaluators at Kingsbury Center came to the same conclusion. Pls.' Exs. A-20, A-21, A-17.

Finally, neither the MDT nor Bijan's parents suspected that he had a speech/language disability. According to the December 3, 2001, MDT meeting notes, which appear to include comments from each party that wished to speak, nobody mentioned that Bijan might have a speech/language disability or that he should be evaluated for one. Pls.' Ex. A-31. Furthermore, both Mr. and Mrs. Razzaghi signed their names at the bottom of the finalized IAP, and Mr. Razzaghi checked the box and signed again next to the following statement: "I AGREE with the contents of this IAP. I have had an opportunity to be involved in the development of this IAP. I have received a copy of this IAP and consent to the implementation of the services in the IAP. I have received a copy of the procedural safeguards and parent rights pertaining to special education." Defs.' Ex. 13 at 1.

The record reflects that prior to implementation of his IAP, nobody—not his teachers, his parents, the school psychologist, or the independent evaluators—suspected Bijan had a speech/language learning disability. It is apparent that a number of people went to great lengths to

11

carefully consider Bijan's weaknesses and evaluate him in order to help him improve both socially and academically. The Razzaghis made no objections to the method or substance of Bijan's evaluations until almost a year later, when they had already pulled him from Eaton and hired a private educational consultant to review his case. Based on these facts, the Razzaghis have not met their burden of persuading the court that the hearing officer's decision should be overturned, or that DCPS violated the IDEA by failing to administer a speech/language evaluation to Bijan.[12]

*2. Appropriateness of the IAP*

A school district can meet its obligation to provide a free appropriate public education by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. Such personalized instruction is accomplished by the implementation of an IAP. *Id.* at 181. The IAP must be "reasonably calculated" to confer educational benefit on the child, *id.* at 207, but it need not "maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Id*. at 200. While courts must ensure that the IAP meets the requirements of IDEA, the Supreme Court has cautioned that they "must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207.

The Razzaghis first contend that the content of Bijan's IAP was inappropriate. Dr.

---

[12]     The Razzaghis point out that when Bijan was in fourth grade at Kingsbury Day School, he underwent a speech/language evaluation, which resulted in a recommendation that he receive speech/language therapy. Pls.' Ex. 12. However, this evaluation occurred in December 2002, more than a year after DCPS evaluated Bijan, and it was thus not available for DCPS to review in formulating Bijan's IEP. Furthermore, that evaluator noted that Bijan's difficulties were only "sporadic and mild," and many of the same skills could be addressed in occupational therapy, which Bijan was receiving before he left Eaton. *Id.*

Iseman testified that "the goals and objectives [should] have been more elaborate." Tr. at 383. Specifically, she concluded that there should have been goals and objectives for reading and speech/language. *Id.* at 279. With respect to reading objectives, Dr. Iseman's opinion is unsupported by the record which reflects that reading was actually a strength for Bijan, who consistently scored at or above his grade level in that subject area. *See* Kindergarten Progress Report, First Grade Report Card, Second Grade Report Card, and Third Grade Report Card, Pls.' Ex. A-37. Furthermore, the independent evaluators at Kingsbury Center found that Bijan scored in the average range for reading in their most recent evaluation on March 13, 2002. Defs.' Ex. 24 at 3. As for Dr. Iseman's assertion that the IAP should have included speech/language objectives, the court reiterates its earlier conclusion that nobody suspected that Bijan had a speech/language learning disability during the time he was at Eaton. The absence of such objectives in his IAP was therefore warranted.

The Razzaghis next contend that the IAP was insufficient because Bijan's needs were such that they could only be addressed if he enrolled in a separate day school for learning disabled students. They rely on Dr. Iseman's opinion that Bijan "needs to be in a full-time special education program, with coordinated services of speech and language, and counseling. He needs to have special education teachers who are familiar with tic disorders, with obsessive-compulsive disorder, with ADHD." Tr. at 294–95. They also submit that when Bijan went in for his follow-up evaluation at Kingsbury Center on March 13, 2002, just two weeks prior to the third IAP meeting, the evaluators at Kingsbury concluded that "[p]lacement in a separate day school program for students with learning disabilities is recommended." Defs.' Ex. 24 at 5.

The Razzaghis' position cannot be sustained. 20 U.S.C. § 1414(d)(3)(A) states that "[i]n developing each child's IAP, the IAP Team . . . shall consider—(i) the strengths of the child; (ii) the concerns of the parents . . .; (iii) the results of the initial evaluation or most recent evaluation . . .; and (iv) the academic, developmental, and functional needs of the child." The record reflects that these are precisely the criteria the MDT used to develop Bijan's IAP. As to Bijan's strengths and needs, when Ms. Bigelow filled out a TAT referral for Bijan, she wrote that "his strengths are verbal expression, comprehension and reading. His weaknesses are attention (staying on task) and writing activities. He also has poor fine motor skills." Pls.' Ex. A-35. Bijan's struggle with math was also well documented. Accordingly, the IAP had specific objectives for writing and math, and Bijan received 7.5 hours per week of concentrated special education in those areas. He also received counseling for his behavioral difficulties and occupational therapy to improve his fine motor skills. Based on this evidence, the IAP appears to have been appropriately tailored to Bijan's needs. As for consideration of the "concerns of the parents," the Razzaghis were involved in planning Bijan's IAP and signed every revision to it. Indeed, in response to her attorney's question regarding her reaction when the IAP was developed, Mrs. Razzaghi testified that "I think [my husband and I] were very excited that there was something that was going to be able to help [Bijan] to get through the educational experience. We were very encouraged and excited, really." Tr. at 101. The record reflects that DCPS made every effort to both listen to the parents' concerns and allow them to be involved in the creation of the IAP.

Finally, the Razzaghis argue that the IAP created for Bijan did not, as required, take into account the most recent Kingsbury evaluation of March 13, 2002. This argument fails because there is nothing that undermines the hearing officer's determination that "[t]he delivery of the evaluation to DCPS for consideration at the March 27, 2002, IAP meeting was not established." Pls.' Ex. B at 11. Mrs. Razzaghi could not definitively say that the MDT possessed this evaluation for consideration at the March 27, 2002, IAP meeting,[13] and there is no mention of the report or its contents in the meeting notes.[14] Because DCPS cannot be held liable for failing to consider a report that it did not have, DCPS is deemed to have fulfilled its obligation to consider Bijan's evaluations, all of which helped shape Bijan's IAP.

In sum, the court cannot conclude that Bijan's IAP was inappropriate. Bijan's teachers consistently noted that he had trouble with writing and math. The IAP specifically addressed both of these subject areas, and by January of 2002 he was receiving 7.5 hours of specialized instruction. The IAP addressed his social and emotional difficulties by giving him psychological counseling every week, and it targeted his fine motor skills through occupational therapy. Both of these were well-documented problem areas for Bijan. Contrary to the Razzaghis' assertions, Bijan's IAP appeared to be responsive to his needs, and he progressed as a result of the help he

---

[13] In response to DCPS counsel's question as to whether she was "a hundred percent clear" that she had presented the Kingsbury report to the school prior to the IEP meeting, Mrs. Razzaghi responded: "I believe I did . . . as soon as I got the report, I made a copy, and sent it straight to the school—probably, in his backpack." Tr. at 202–03.

[14] Even if the MDT did have possession of the most recent Kingsbury evaluation at the time of the third IEP meeting, 20 U.S.C. § 1414(d)(3)(A) does not require the MDT to follow the advice of independent evaluators; rather, it requires the MDT to "consider" a variety of factors in formulating the IEP. Hence, the MDT would not be required to adhere to the recommendation to transfer Bijan to a separate day school as long as it was considered.

was receiving.[15]  The Razzaghis' repeated agreement with the terms of Bijan's IAP also cannot be disregarded.  The Razzaghis have failed to meet their burden of persuading the court that the hearing officer's determination should be overturned.

**3. Procedural Violations**

The D.C. Circuit has emphasized that "IDEA relief depends on 'equitable considerations.'" *Reid*, 401 F.3d at 523, (citing *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 15–16 (1993)).  While it is true that courts must enforce procedural compliance with IDEA, a violation will be "disregarded as harmless" unless it resulted in substantive harm. *Hymes v. Dist. of Columbia*, 2005 U.S. Dist. LEXIS 3032, at *10 (D.D.C. March 2, 2005) (citing *DiBuo v. Bd. of Educ. of Worcester Cty.,* 309 F.3d 184, 190–91 (4th Cir. 2002); *Doe v. Alabama State Dept. of Educ.,* 915 F.2d 651, 661–64 (11th Cir. 1990); *Muth v. Cent. Bucks Sch. Dist.,* 839 F.2d 113, 127 n.15 (3rd Cir. 1988)).

The Razzaghis first argue that they are entitled to relief because DCPS failed to provide appropriate educational services to Bijan within 120 days of submission of the TAT form. Section 141 of the District of Columbia Appropriations Act of 2000, Pub. L. No. 106–113, 113 Stat. 1501, requires that "not later than 120 days after the date that a [DCPS] . . . student is referred for an evaluation or assessment," DCPS shall evaluate the student and, if she qualifies,

---

[15]   The hearing officer reported that Ms. Singh, who had more contact with Bijan at school than anyone else during the time he was receiving special education, testified that he was "an average and normal third grader" who made progress throughout the year and "had a successful third grade." Pls.' Ex. B at 3.  She also noted that "at no time did the parents express any displeasure with the student's progress at Eaton." *Id.*  On Bijan's final report card, she wrote: "Bijan has shown significant growth throughout the year." Teacher Comments, 6/18/02, Pls.' Ex. A-37.  As a member of the MDT, Ms. Singh was aware of Bijan's difficulties, yet she expressed no concern that his IAP was ineffective or that he needed to be in a separate school.

provide her with special education services. Ms. Bigelow submitted a TAT to DCPS on May 21, 2001, requesting that Bijan be evaluated. Pls.' Ex. A-35. Dr. Kuhn did not conduct an evaluation until November 28, 2001, 71 days past the deadline.

While DCPS indisputably failed to meet the 120-day time limit, it went to great lengths to correct the deficiency by thoroughly evaluating Bijan and implementing an IAP that provided Bijan appropriate educational services. Had DCPS failed to provide such services, and thereby forced the Razzaghis to take Bijan elsewhere for a proper education, there would be no question that they would be entitled to relief. That is not what occurred, however, for the Razzaghis transferred Bijan to Kingsbury while he was receiving an appropriate education at Eaton. Given that the delay was just over two months and that DCPS took pains to provide Bijan his due, the relief sought by the Razzaghis is not warranted.

Finally, the Razzaghis argue that DCPS violated 34 C.F.R. § 300.511 by failing to reach a final decision in the hearing within 45 days of receipt of the Razzaghis' request for a hearing.[16] The Razzaghis are correct, for they requested a hearing on January 17, 2003, and the hearing officer did not make his final determination until July 3, 2003. However, no harm resulted from the violation of the 45-day time limit because Bijan had already been withdrawn from Eaton for over four months by the time the Razzaghis requested a hearing.[17]

---

[16]   34 C.F.R. § 300.511(a) provides that "not later than 45 days after receipt of the request for a hearing—(1) a final decision [must be] reached in the hearing."

[17]   The Razzaghis' contention that the delay prejudiced them because it caused them to have two different hearing officers fails because they have not identified any actual harm that resulted from being "forced to present their case before a new hearing officer unfamiliar with the first day of the hearing." Pls.' Mot. for Summ. J. at 30.

## CONCLUSION

For the reasons discussed herein, the Razzaghis' motion for summary judgment is denied, and DCPS' motion for summary judgment is granted. An appropriate order accompanies this memorandum.

                                        Henry H. Kennedy, Jr.
                                        United States District Judge

Dated:  September 28, 2005